## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRUCE X. COOPER,

          Plaintiff,

    v.

JOHN WETZEL, *et al.*,

          Defendants.

No. 4:21-CV-01793

(Chief Judge Brann)

## MEMORANDUM OPINION

### JULY 6, 2023

Plaintiff Bruce X. Cooper filed the instant *pro se* Section 1983[1] action,

claiming constitutional violations with respect to COVID-19 pandemic

management at his prison.  Defendants now move for summary judgment on the

basis that Cooper failed to administratively exhaust his Eighth Amendment claims.

For the following reasons, the Court will grant in part and deny in part Defendants'

Rule 56 motion.

## I.    BACKGROUND

During all relevant times, Cooper has been incarcerated at the State

Correctional Institution in Dallas, Pennsylvania (SCI Dallas).[2]  At the time he filed

---

[1]    42 U.S.C. § 1983.  Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials.  The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

[2]    Doc. 11 ¶ 3.

his lawsuit in September 2021, Cooper described himself as a 65-year-old "elderly male" who has been in state custody for over 30 years.[3]  He asserts that he has preexisting hypertension, heart disease, pulmonary disease, and "a host" of other serious medical conditions.[4]

In his complaint, Cooper alleged that, due to gross mismanagement, facility disrepair and lack of ventilation, absence of oversight, insubordination of rank-and-file correctional officers, and failure to enforce Pennsylvania Department of Corrections (DOC) policy, the COVID-19 virus[5] spread unchecked throughout SCI Dallas and he was eventually infected.[6]  He claimed that, as a result of his infection, he suffered serious side effects including deep vein thrombosis (DVT) and long-term respiratory problems, as well as mental and emotional injuries.[7]  He named as defendants three DOC officials: John Wetzel (then-Secretary of Corrections for the DOC), Kevin Ransom (Superintendent of SCI Dallas), and Erin Brown (Director of the Office of Population Management for the DOC).[8]  Cooper maintained that these officials had knowledge of the allegedly unconstitutional

---

[3]  *Id.* ¶ 7.
[4]  *Id.*
[5]  The COVID-19 virus is also known as "severe acute respiratory syndrome coronavirus 2" and "SARS-CoV-2."  *Naming the Coronavirus Disease (COVID-19) and the Virus that Causes It*, WORLD HEALTH ORG., https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it (last visited June 14, 2023).  The Court refers to the virus herein as "the COVID-19 virus" and to the disease it causes as "COVID-19."
[6]  *See generally* Doc. 11 ¶¶ 8-74.
[7]  *Id.* ¶¶ 60, 75, 77.
[8]  *Id.* ¶¶ 4-6.

conditions at SCI Dallas and either took no action or instituted practices that exacerbated the pandemic's effects at the facility.[9]

Cooper initially filed his complaint in the Court of Common Pleas of Luzerne County, Pennsylvania.[10]  After being served, Defendants removed the case to this Court.[11]  Cooper asserted a Section 1983 Eighth Amendment claim against all Defendants alleging unconstitutional conditions of confinement.[12]  He also alleged state-law negligence by Wetzel and Ransom.[13]

Defendants moved to dismiss Cooper's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[14]  The Court granted in part and denied in part that motion.[15]  The Court dismissed Cooper's Section 1983 claim against Brown because he had failed to plead an Eighth Amendment violation and because he had failed to allege a connection between Brown's purported conduct and his harm.[16] The Court also dismissed the negligence claims against Wetzel and Ransom because those claims were barred by state statutory sovereign immunity.[17]

---

[9]    *Id.* ¶¶ 39, 46, 50-51, 55, 68-73.
[10]   *See* Doc. 1-1 at 1.
[11]   Doc. 1.
[12]   Doc. 11 ¶¶ 80-84.  Cooper sets out two counts under an Eighth Amendment umbrella, but these purportedly separate counts are really a single conditions-of-confinement claim involving the alleged conditions at SCI Dallas to which Cooper claims he was subjected during the height of the COVID-19 pandemic.  *See id.*
[13]   *Id.* ¶¶ 85-89.
[14]   Doc. 4.
[15]   *See generally* Docs. 13, 14.
[16]   *See* Doc. 13 at 9.
[17]   *See id.* at 10-11.

Brown's Eighth Amendment conditions-of-confinement claim was permitted to proceed against Wetzel and Ransom.[18]

In November 2022, Wetzel and Ransom moved for summary judgment on the limited issue of failure to exhaust administrative remedies.[19]  After extensive briefing, that motion is fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[20]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[21]  Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[22]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[23]  The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all

---

[18]   *See id.* at 6-9, 12.
[19]   *See generally* Doc. 49.
[20]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).
[21]   FED. R. CIV. P. 56(a).
[22]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).
[23]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

reasonable inferences in that party's favor."[24]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[25]  A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]."[26]  Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party.[27]

## III.   DISCUSSION

Defendants argue that Cooper failed to properly exhaust his conditions-of-confinement claim through the DOC's grievance system and therefore his claim is now defaulted.  They contend that most (if not all) of the conditions about which Cooper complains were never brought to the attention of the DOC through the grievance process.  They additionally claim that Cooper failed to properly identify either remaining Defendant in his grievances.

### A.    Administrative Exhaustion for Pennsylvania DOC

The Prison Litigation Reform Act of 1995 (PLRA)[28] requires prisoners to exhaust available administrative remedies before suing prison officials for alleged

---

[24]   *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

[25]   *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).

[26]   *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).

[27]   *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

[28]   42 U.S.C. § 1997e *et seq*.

constitutional violations.[29]  Proper exhaustion is mandatory, even if the inmate is seeking relief—like monetary damages—that cannot be granted by the administrative system.[30]  The exhaustion process a prisoner must follow is governed by the contours of the prison grievance system in effect where the inmate is incarcerated.[31]

Pennsylvania's Department of Corrections employs a three-step grievance process that must be completed to properly exhaust administrative remedies in most cases.[32]  If informal resolution attempts do not solve the problem, the first step is to file a written grievance (using form DC-804, Part 1) with the Facility Grievance Coordinator within 15 working days after "the event upon which the claim is based."[33]  An adverse decision by the grievance coordinator must be appealed to the Facility Manager within 15 working days of the initial-review response or rejection.[34]  Finally, an adverse decision by the Facility Manager must be appealed to "Final Review" with the Secretary's Office of Inmate Grievances

---

[29]  *See* 42 U.S.C. § 1997e(a); *Ross v. Blake*, 578 U.S. 632, 639, 642 (2016) (explaining that only "available" remedies must be exhausted).

[30]  *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).

[31]  *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Woodford*, 548 U.S. at 90-91.

[32]  *See Booth v. Churner*, 206 F.3d 289, 292 n.2 (3d Cir. 2002); COMMONWEALTH OF PA., DEP'T OF CORR., INMATE GRIEVANCE SYS., Policy No. DC-ADM 804 (May 1, 2015) (hereinafter "DC-ADM 804").

[33]  DC-ADM 804 § 1(A)(3)-(5).

[34]  *Id.* § 2(A)(1).

and Appeals (SOIGA), and again must be submitted within 15 working days of the date of the Facility Manager's decision.[35]

The DOC has specific requirements for grievances submitted by inmates. Those requirements include, among other things, that the grievance "be legible [and] understandable"; "include a statement of the facts relevant to the claim" as well as "the date, approximate time, and location of the event(s) that gave rise to the grievance"; that the prisoner "identify individuals directly involved in the event(s)"; and that the grievance include "the specific relief sought," including "compensation or other legal relief normally available from a court."[36]

### B.    Cooper's Eighth Amendment Claims

To survive Defendants' Rule 56 challenge, Cooper must have properly exhausted his Eighth Amendment conditions-of-confinement claims against Wetzel and Ransom.  His complaint raises a litany of allegedly unconstitutional conditions at SCI Dallas.  Those conditions include the following:

- Cooper requested to be tested for COVID-19 at some unspecified time and his request was denied by Ransom based on policies established by Wetzel.[37]

- Rank-and-file corrections officers were "flout[ing]" COVID-19 protection protocols "with impunity" by, *e.g.*, failing to wear masks as mandated, failing to properly socially distance, improperly commingling with infected and uninfected inmates, ignoring COVID-19 screening

---

[35] *Id.* § 2(B)(1).

[36] *Id.* § 1(A)(11).

[37] Doc. 11 ¶ 8.

protocols, reporting to work after being exposed or infected without quarantining, and declining to be tested.[38]

- Officials knew of and permitted the existence of certain facility conditions (like poor ventilation, lack of sufficient numbers of working showers, and inmates being housed too close together) that caused or exacerbated the spread of the COVID-19 virus in SCI Dallas.[39]

- Defendants abused or subverted the "cohort system,"[40] which exacerbated the spread of the COVID-19 virus in SCI Dallas.[41]

- Defendants failed to timely conduct COVID-19 screening across the entire inmate population and underreported infection rates.[42]

- At the beginning of the pandemic, Ransom converted the gymnasium into a "Covid-19 ward" that had "a number of beds in a cubicle, separated by a plastic curtain," with "only one toilet" and insufficient cleaning.  Subsequently, inmates were inadequately quarantined in the "E.V.O." location in an area of the basement.  In other words, the prison's quarantine procedures were insufficient.[43]

## C.   Cooper's Grievances

It is undisputed that Cooper filed at least two grievances related to COVID-19.  His first grievance—number 873096—was filed on June 9, 2020.[44]  In that grievance, Cooper claimed that he was summoned by prison officials to attend a

---

[38]   *Id.* ¶¶ 11, 19, 31, 32, 34, 37-40.
[39]   *Id.* ¶¶ 12, 14, 20, 21, 45, 46.
[40]   Cooper describes the "cohort system" as a method of inmate movement that allowed "groups of inmates" to move and remain together, apparently to mitigate the risk of spreading COVID-19 between groups.  *See* Doc. 11 ¶ 47.
[41]   *Id.* ¶¶ 47, 50-52.
[42]   *Id.* ¶¶ 59-62.
[43]   *Id.* ¶¶ 26-28.
[44]   *See* Doc. 50-3 at 2.

post-surgery follow-up medical appointment at Geisinger Hospital.[45]   Cooper

asserted that, when he asked about his status upon return from the hospital, he was

informed that he would have to quarantine for two weeks.[46]   He "refused the

medical treatment to avoid being punished," apparently considering being

quarantined as a form of punishment.[47]   Cooper argued that the escorting officer

would encounter the same conditions as a prisoner attending an outside medical

appointment, but that the officer would not have to quarantine.[48]   He also

complained that if he were quarantined, he would miss a teleconference call with

"attorneys for the Middle District Court" because "there is no leaving quarantine

until quarantine is over."[49]   Cooper contended that there was a "double standard"

with respect to the quarantine requirements of corrections officers and inmates and

sought as relief "the sum of $6,573."[50]   Nowhere in this grievance does he identify

a responsible party or name any individual involved in the incident.

The Facility Grievance Coordinator responded that the DOC "Central Office

and . . . Bureau of Health Care [S]ervices" had instituted numerous procedural

changes to address the pandemic, which included the quarantine requirement for

prisoners returning from community hospitals.[51]   The Coordinator further

---

[45]   *See id.*
[46]   *Id.*
[47]   *Id.*
[48]   *Id.*
[49]   *Id.*
[50]   *Id.*
[51]   Doc. 50-3 at 3.

admonished that this quarantine procedure was not a punishment and would not be subject to exceptions, and that if inmates did not want to quarantine upon returning from an outside hospital, they could decline to attend their medical appointment as Cooper had done (although this option was "not encouraged").[52]  The Coordinator concluded that there had been "no evidence of wrongdoing" and denied the grievance.[53]

Cooper appealed to the Facility Manager (Ransom), essentially arguing that the quarantine policy was being unfairly applied only to inmates and not corrections officers.[54]  He additionally claimed that "staff are not required [to] quarantine for 14 days, nor are staff removed upon returning from hospital trips[] from cell blocks or social distances [sic] from me," and thereby "place my health at risk of serious harm … and worst [sic]."[55]  Ransom upheld the initial response and denied Cooper's appeal, explaining that "policies and procedures have been set forth by the DOC governing body and those rules will be followed."[56]

Cooper appealed to final review with the SOIGA, arguing that there was a "double standard and discrimination" by subjecting inmates who attended outside medical appointments to quarantine but not the escorting corrections officers.[57]  He

---

52  *Id.*
53  *Id.*
54  *Id.* at 4.
55  *Id.* (third alteration in original).
56  *Id.* at 5.
57  *Id.* at 6.

claimed that this unfair treatment caused him to choose between attending his

medical appointment (and then being quarantined) or participating on his legal call

the following day.[58]  The Chief Grievance Officer denied Cooper's appeal, finding

that he had "failed to provide any evidence" that he would be "punished" by

having to be quarantined if he attended his outside medical appointment.[59]

Cooper's next grievance—number 897195—was filed on October 23,

2020.[60]  In this grievance, Cooper asserted that he had recently undergone

emergency lung surgery and that on October 15, 2020, prison officials had allowed

an inmate who had recently returned from an outside hospital and had also been in

the prison's infirmary to "return to cell block" either untested or tested with "false

results."[61]  Officials then recalled this inmate to the infirmary that night to be

quarantined because he was actually positive for COVID-19.[62]  Cooper alleged that

when unidentified "officials" permitted this inmate to return to the housing unit,

they had placed Cooper in "imminent and immediate danger of risk of contracting"

the COVID-19 virus and had created a risk to his "safety and future health."[63]

On the second page of grievance 897195, Cooper launched a broader attack

on the conditions at SCI Dallas and sought "immediate release from detention."[64]

---

[58]  *Id.*
[59]  *Id.* at 7.
[60]  *See* Doc. 50-2 at 2-3.
[61]  *Id.* at 2.  By "false results," it is presumed that Cooper means a false-negative test result.
[62]  *Id.*
[63]  *Id.*
[64]  *Id.* at 3.

He invoked both the Eighth Amendment's cruel-and-unusual-punishments clause as well as habeas corpus principles.  Cooper identified the following allegedly unconstitutional conditions at SCI Dallas: (1) the impossibility of practicing social distancing, (2) staff who "come[] and go[] in and out of the prison," (3) staff who only wear face-covering masks "when it is 'called for,'" (4) the impossibility of avoiding contact with and "touching surfaces" in the prison, (5) the fact that officials "cannot guarantee against covid injury or placement in the 'hot-spot' prison infirmary," and (6) only one "hotel size bar of soap" provided to inmates per week.[65]

Notably, Cooper additionally alleged that "the warden/Superintendent [] cannot practice nor implement preventative measures in this facility to combat a global pandemic."[66]  He asked for "immediate release"[67] and also sought compensatory damages in the amount of $45,000 "for any caused covid-19 virus injuries" and $17,000,000 for "all and any irreparable or terminal injuries caused by covid virus as a result of [the] conditions of confinement."[68]

The Facility Grievance Coordinator provided a brief summation of Cooper's grievance and then denied it.[69]  The Coordinator stated, "SCI Dallas is following

---

[65]  *Id.*
[66]  *Id.*
[67]  *Id.*
[68]  *Id.* at 2.
[69]  *See* Doc. 50-2 at 4.

the protocol directed by the cdc[] and doc," and that—with regard to the infected inmate episode—"as soon as the first person had symptoms, staff followed the protocol for quarantine[.]"[70]

Cooper appealed to the Facility Manager on December 14, 2020.[71]  In addition to discussing the circumstances surrounding the infected inmate who was sent back to his cell block, Cooper sought "immediate compassionate release where Mr. Ransom nor Pam Smith can protect me from an air borne [sic] deadly virus and[] the conditions of confinement restraining" him were themselves a risk to his safety.[72]  Cooper also reiterated his concern regarding "infected staff" entering the prison undetected.[73]

The Facility Manager—Ransom—denied the appeal on March 5, 2021.[74]  He noted that the exposure from the single infected inmate, while perhaps showing negligence, did not mean that staff members were "intentionally putting [Cooper] at risk."[75]  He further reassured Cooper that prison officials were "taking all precautions necessary" and had "implemented exhaustive measures and procedures that continue to keep the inmate population safe."[76]  Ransom additionally

---

[70] *Id.*
[71] *See* Doc. 50-2 at 5.
[72] *Id.*
[73] *Id.*
[74] *See* Doc. 50-2 at 6.
[75] *Id.*
[76] *Id.*

explained that the "procedures in place recommended by the DOC and CDC" were "being strictly enforced."[77]

Cooper appealed to final review with the SOIGA, which appeal was likewise denied.[78]  It appears that, shortly after he submitted his appeal to the Facility Manager on December 14, 2020 (but prior to receiving a response or appealing to the SOIGA), he contracted COVID-19.[79]  In his final appeal, Cooper maintained that, "under the conditions of confinement within the DOC," he was in "imminent danger."[80]  He alleged that "the warden cannot despite his best efforts prevent staff from bringing any one of the three" COVID-19 virus variants "into the prison."[81] He also asserted that "it is impossible to avoid direct contact [with] staff who[] recklessly disregard[] the seriousness of the covid virus."[82]  The Chief Grievance Officer summarily denied Cooper's appeal, stating that prison staff "are doing the best they can."[83]

In his surreply to the instant Rule 56 motion, Cooper points to an additional grievance—number 914776.[84]  The basis of that grievance appears to be that SCI

---

[77]  *Id.*
[78]  *See* Doc. 50-2 at 7-8.
[79]  *See id.* at 7 (noting, in his appeal to the SOIGA, that he did in fact "contract this deadly virus"); *see also* Doc. 11 ¶ 58 (averring that on December 28, 2020, he was informed that his December 26 instant COVID-19 test was positive and he was immediately quarantined).
[80]  Doc. 50-2 at 7.
[81]  *Id.*
[82]  *Id.*
[83]  *Id.* at 8.
[84]  *See generally* Doc. 69-3.

Dallas officials mishandled or failed to respond to two appeals with respect to grievance numbers 873078[85] and 897195.  No new claims or allegations are raised in grievance 914776 and it relates only to Cooper's desire to complete the appeal process for the earlier grievances.  Because grievance 914776 was resolved in his favor and Cooper was permitted to refile the requested appeals, and because it raises no new issues or identifies any other defendants, it is irrelevant for the instant exhaustion question.

### D.   Limited Exhaustion Occurred

The upshot of the comprehensive review of Cooper's grievances is that he exhausted some, but not all, of his Eighth Amendment claims.  First, Cooper properly grieved his claim against defendant Ransom, but not against defendant Wetzel.  Cooper specifically identified "Ransom" or "the warden" or the "Superintendent" several times in grievance 897195 and its appeals, as specified above.  Nowhere, however, does Cooper mention or identify "Wetzel" or the "Secretary" of the DOC, or make any other reference to Wetzel that could reasonably be construed as "identify[ing an] individual[] directly involved in the event(s)" as required by DC-ADM 804.[86]  Simply put, Cooper never filed any grievance that would have put SCI Dallas officials on notice that he was blaming or

---

[85]   Grievance number 873078 concerned "the serving of white bread and white potatoes" in Cooper's meals in violation of his religion and is unrelated to any COVID-19 issue.  *See* Doc. 69-3 at 3.

[86]   DC-ADM 804 § 1(A)(11)(b).

implicating Wetzel for the alleged unconstitutional conditions of confinement.  And

as the United States Court of Appeals for the Third Circuit has admonished, "The

purpose of the regulation here is to put the prison officials on notice of the persons

claimed to be guilty of wrongdoing."[87]

Cooper's arguments to the contrary are unpersuasive.  He claims that—even

though nothing in his grievances mentions Wetzel—notice was provided because

"defendants acquired direct access to Plaintiff's pro[]se complaint."[88]  This

argument puts the cart before the horse.  The PLRA specifically requires

administrative exhaustion *before* filing a lawsuit so that prison officials can address

or rectify a problem before it escalates into civil litigation.

Cooper additionally argues that Wetzel may be liable under Section 1983 as

a supervisor based on certain policy decisions because "every decision, policy and

practice came directly from defendant Wetzel."[89]  Even assuming this extremely

broad proposition is true, supervisor liability is not presently at issue in the instant

Rule 56 motion.  Moreover, this theory of liability does not establish that Cooper's

grievances identified or referenced Wetzel as a target of the conditions-of-

---

[87]  *Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004) (citing an older version of DC-ADM 804 related to defendant identification in grievances).

[88]  Doc. 63 at 1, 2.  Cooper also references a "1992 Environmental Inspection," *see id.* at 1, but he does not explain how this decades-old inspection would have put Defendants on notice—in 2020—of Cooper's COVID-19-related conditions-of-confinement allegations.

[89]  *Id.* at 3-4.

confinement claim or that Wetzel was "fairly within the compass" of those grievances.[90]

In sum, there is a distinct failure by Cooper to identify Wetzel in his grievances and none of the DOC's responses or actions excused this failure.[91] Identification is mandated by DC-ADM 804, therefore Cooper has procedurally defaulted his Eighth Amendment claim against Wetzel.[92]  And because Cooper has proffered no excuse for his procedural default, summary judgment must be granted in Wetzel's favor.[93]

The Court next turns to the conditions-of-confinement claim itself.  As demonstrated by the above recitation of the allegations in Cooper's complaint and those asserted in his grievances, a substantial number of conditions were never raised by Cooper during the grievance process.  Even under the most generous

---

[90] *See Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Spruill*, 372 F.3d at 234).

[91] *Cf. Williams*, 482 F.3d at 640; *Spruill*, 372 F.3d at 234 (determining that, if prison officials identified the unidentified actor(s) during the grievance process, inmate's procedural default of failing to name those actors would be excused).

[92] *See Spruill*, 372 F.3d at 230 (holding that PLRA includes a procedural default component); *Byrd v. Shannon*, 715 F.3d 117, 127 & n.5 (3d Cir. 2013) (finding that summary judgment was properly granted in defendant's favor where inmate failed to identify defendant in his grievance and "there is no indication that prison administrators were aware that [defendant] was allegedly involved with the events surrounding the grievance"); *see also Oliver v. Wetzel*, 861 F. App'x 509, 516 (3d Cir. 2021) (nonprecedential) (holding that inmate failed to exhaust administrative remedies because he "never identified [the defendant] by name in his initial grievance or in any of his appeals, as was required to exhaust a claim against him, and grievance officers did not name [the defendant] in that process such that [the inmate]'s failure to name him could be excused"); *Johnson v. Townsend*, 314 F. App'x 436, 441-43 (3d Cir. 2008) (nonprecedential) (same); *Williams v. Pa., Dep't of Corr.*, 146 F. App'x 554, 557 (3d Cir. 2005) (nonprecedential) (same).

[93] *See Byrd*, 715 F.3d at 127; *Spruill*, 372 F.3d at 231.

construction, nothing in Cooper's grievances can be seen as asserting a claim

regarding abuse or subversion of the "cohort system," insufficient COVID-19

screening or reporting with respect to the inmate population, building conditions

(like lack of appropriate ventilation and shower space) that allegedly exacerbated

the spread of the COVID-19 virus, denial of Cooper's request to be tested for

COVID-19 at some unspecified time, or inadequate quarantine spaces like the

gymnasium "Covid-19 ward" or the basement "E.V.O." location.  These allegedly

unconstitutional conditions were simply never presented to prison officials, and thus

they were never properly exhausted.  Put differently, there is no way prison officials

could have addressed or remediated these conditions because Cooper never brought

them to the officials' attention.

On the other hand, it appears that Cooper did raise and exhaust his claims

regarding reckless staff behavior with regard to COVID-19 protection protocols, the

impossibility of social distancing, infected staff entering the prison and

commingling with inmates, and lack of sanitizing supplies.  These conditions were

asserted in grievance 897195 and its appeals and were properly exhausted through

final review with the SOIGA.

The Court rejects Cooper's assertion that his grievances properly exhausted

every aspect of his conditions-of-confinement claim.  Cooper first argues that he did

not need to include all the conditions about which he is currently suing, relying

primarily on *Strong v. David*, 297 F.3d 646 (7th Cir. 2002), a nonbinding, decades-old case from the Seventh Circuit.[94]  Citing *Strong* and several unpublished, out-of-circuit district court cases, Cooper claims that he did not need to specify "the relief" or every "remedy later sought in litigation" in his grievances.[95]  While that may or may not be accurate under the DOC's grievance policy,[96] the issue at bar is not the remedies or relief sought, but whether Cooper grieved his allegedly unconstitutional conditions of confinement.

Cooper next argues that, by saying "conditions of confinement" in grievance 897195, he sufficiently exhausted the instant Eighth Amendment claim and it was up to prison officials to seek more detail.[97]  The Court disagrees.  Had Cooper simply filed a grievance stating that he was objecting to his "conditions of confinement," the onus may have been on prison officials to inquire further as to what conditions Cooper was challenging or to make him elaborate on his claim.[98]  But Cooper *did* identify the specific conditions about which he was complaining in grievance 897195 (as fully recounted above), so prison officials had no reason to

---

[94]  *See* Doc. 71 at 1-3.

[95]  *Id.* at 2 (quoting *Hernandez-Arredondo v. Hollingsworth*, No. 10-cv-0875, 2012 WL 3047735, at *5 (S.D. Ill. June 29, 2012) (report and recommendation) (quoting *David*, 297 F.3d at 649)).  The Court notes that *Hernandez-Arredondo* is largely inapposite because it is an unpublished district court report and recommendation from the Southern District of Illinois that was addressing Federal Bureau of Prisons exhaustion requirements.

[96]  *See* DC-ADM 804 § 1(A)(11)(d) ("If the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance.").

[97]  *See* Doc. 71 at 3.

[98]  *See Rinaldi v. United States*, 904 F.3d 257, 271-72 (3d Cir. 2018).

further inquire about the conditions which Cooper claimed were violating his constitutional rights.

Finally, Cooper appears to contend that—because he submitted grievance 897195 regarding unconstitutional COVID-19-related conditions, he could not file a subsequent grievance to raise the other COVID-19-related conditions he now asserts in his lawsuit because that grievance would have been rejected as duplicative.[99]  Cooper is incorrect.

Although it is true that, under DC-ADM 804, Cooper could not re-raise the same conditions of confinement complained of in grievance 897195 in a subsequent grievance,[100] nothing in the DOC's grievance policy prohibits an inmate from lodging an additional or new grievance regarding allegedly unconstitutional conditions of confinement based on different or new conditions.  Thus, Cooper had the option of including all the conditions alleged in the instant lawsuit in a single grievance or, if the conditions developed at different times during the pandemic (as Cooper seems to maintain),[101] in subsequent grievances when Cooper was subjected to those additional conditions.

---

[99]  *See* Doc. 63 at 3.

[100]  *See* DC-ADM 804 § 1(A)(15) ("Any grievance issue that has been or is currently being addressed will not be readdressed in a subsequent grievance.  Any concern disputing previous grievances, initial review responses, appeal decisions, or actions of staff members who rendered those decisions should be addressed through the appeal process outlined in Section 2 of this procedures manual.").

[101]  *See* Doc. 63 at 3 (stating that "the underlying facts asserted [in this lawsuit] occurred over a period of time within the course of the covid pandemic").

What Cooper cannot do is file a civil rights lawsuit that includes numerous allegedly unconstitutional conditions of confinement that were never brought to the attention of prison officials through the administrative process.  Otherwise, an inmate could simply complain of one condition of confinement in a prison grievance and then—after exhausting that claim—file suit in federal court based on a multitude of *other* purportedly unconstitutional conditions, maintaining that he "exhausted" his Eighth Amendment claim.  This tactic would eviscerate one of the core purposes of the PLRA's exhaustion requirement: reducing "the number of meritless inmate lawsuits challenging prison conditions" by "returning control of the inmate grievance process to prison administrators, encouraging the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reducing the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits."[102]

To conclude, Cooper exhausted his Eighth Amendment conditions-of-confinement claim against Ransom but not Wetzel.  That Eighth Amendment claim against Ransom, however, is limited to the conditions of confinement that Cooper asserted in grievance 897195,[103] as they are the only allegedly unconstitutional

---

[102] *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (internal quotation marks and citation omitted); *see Rinaldi*, 904 F.3d at 271-72.

[103] Although Cooper fully exhausted grievance 873096, the claim of disparate quarantine treatment between corrections officers and prisoners that was the basis of that grievance does not appear in Cooper's complaint.  Thus, it has no relevance to the instant lawsuit.

conditions Cooper properly exhausted by bringing them to the attention of SCI

Dallas officials through the administrative process.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part

Defendants' motion for summary judgment (Doc. 49) pursuant to Federal Rule of

Civil Procedure 56.  An appropriate Order follows.


BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge